FILED
04/10/2026
*Amy McGhee*
CLERK
Missoula County District Court
STATE OF MONTANA
By: Michelle Mills
DV-32-2026-0000420-WS
Larson, John W
1.00

Adrienne M. Tranel
AT Legal PC
401 Washington Street, Suite 301
Missoula, Montana 59802
Telephone: (406) 218-4850
Facsimile: (406) 218-4941
Email: atranel@atlegalmt.com
*Attorneys for Plaintiff*

**MONTANA FOURTH JUDICIAL DISTRICT COURT**
**MISSOULA COUNTY**

| | |
|---|---|
| **STEPHEN C. SIEGEL,**<br>Plaintiff,<br><br>v.<br><br>**LEIDOS, INC., a Corporation,**<br>Defendant. | Cause No.: DV-32-2026-0000420-WS<br>**John W. Larson**<br>**Dept. 3**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff Stephen C. Siegel ("Mr. Siegel" or "Plaintiff"), by and through undersigned counsel, Adrienne M. Tranel, of the firm AT Legal PC, and for his Complaint and Demand for Jury Trial alleges as follows:

## PARTIES

1. At all times relevant to this Complaint, Stephen C. Siegel was a resident of Missoula County, Montana with a physical address of 520 Woodford Street, Missoula, Montana 59801.
2. Defendant Leidos, Inc. ("Leidos" or "Defendant") is a corporation with its principal place of business and corporate headquarters at 1750 Presidents Street, Reston, Virginia 20190. Leidos, Inc. has a registered agent for service

of process in the State of Montana located at CT Corporation System, 3011 American Way, Missoula, Montana 59808.

## JURISDICTION AND VENUE

3. Plaintiff re-alleges and re-affirms all allegations contained in the above paragraphs as if set forth herein.

4. At all times relevant hereto, Plaintiff Stephen C. Siegel lived in Missoula County, Montana, and was an employee of Defendant Leidos, Inc. Mr. Siegel performed his work remotely from his home office in Missoula, Montana, and Montana state income taxes were withheld from his compensation.

5. The claims which give rise to this action occurred in Missoula County, Montana.

6. Defendant Leidos, Inc., is subject to the requirements of the Montana Wrongful Discharge from Employment Act. Leidos employs more than 47,000 employees and conducts operations in Montana through its Montana-based employees, including Mr. Siegel. Mr. Siegel was employed by Leidos from May 24, 2004, through April 15, 2025, well beyond the probationary period, and Montana law governs his employment relationship with Leidos.

7. Likewise, Defendant Leidos is subject to the requirements of the Montana Human Rights Act and the Age Discrimination in Employment Act, both of which prohibit discrimination in employment on the basis of an employee's age.

8. Mr. Siegel exhausted his administrative remedies with respect to his claim of discrimination. He filed a complaint of discrimination based on age with the

Equal Employment Opportunity Commission and received a notice of right to sue in this Honorable Court.

9. By virtue of the location of the incidents at issue in this matter and the laws of the State of Montana, an action to recover damages is governed by the laws of the State of Montana and/or federal law.

10. Venue and Jurisdiction are proper in this Honorable Court.

11. This matter concerns Defendant's termination of Plaintiff's employment in violation of Defendant's own written internal policies and procedures, in violation of the Montana Wrongful Discharge from Employment Act ("WDEA"), codified at Mont. Code Ann. § 39-2-904(1)(c).

12. This matter also concerns Defendant's termination of Plaintiff's employment without good cause, in violation of the Montana Wrongful Discharge from Employment Act ("WDEA"), codified at Mont. Code Ann. § 39-2-904(1)(b).

13. This matter also concerns Defendant’s termination of Mr. Siegel because of his age, in violation of the ADEA (codified at 29 U.S.C. §621, *et seq.*, and the MHRA (codified at Mont. Code Ann. §§ 49-2-101 and 49-2-303 *et seq.*).

## <u>FACTS COMMON TO ALL COUNTS</u>

14. Plaintiff re-alleges and re-affirms all allegations contained in the above paragraphs as if set forth herein.

### Employment History and Performance

15. Leidos hired Mr. Siegel on May 24, 2004, as a Technical Editor. Mr. Siegel started his employment on-site in New Mexico in 2004; then began remote

work from New York in 2008; remote work from California in 2012; and finally remote work from Missoula, Montana, as of 2013 to the time of his termination on April 15, 2025. Throughout his remote employment, while Mr. Siegel was in Montana, Montana state income taxes were withheld from Mr. Siegel's compensation.

16. During his two decades of employment with Leidos, Mr. Siegel held various positions, including Technical Editor II, Editing Specialist V, Group Writer/Editor, Content Manager, Marketing Technology Project Manager, and Communications Manager. At the time of his termination, Mr. Siegel held the position of Communications Manager in the Enterprise Communications department within Corporate Communications and Marketing, earning an annual salary of approximately $120,000.

17. As Communications Manager, Mr. Siegel was responsible for all aspects of conceptualizing, planning, and executing communication strategies and tactics. His duties included ghost writing communications for executives and functional teams, contributing to the CEO monthly video update, managing enterprise-level communications such as the global employee newsletter, writing and editing communications for accuracy and tone, training new hires, managing enterprise intranet content and campaigns, and collaborating with Corporate Communications and stakeholder teams across the enterprise.

18. For nearly 20 years of his employment, Mr. Siegel consistently received strong performance reviews from multiple supervisors. From 2011 through 2023, Mr.

Siegel received ratings of "Far Exceeds Expectations," "Frequently Exceeds Expectations," "Strong Performance," and "Valued Performance." His supervisors praised his work in glowing terms. In 2013, supervisor Susan Klemens wrote that Mr. Siegel was "a loyal and trusted employee" and "a keeper." In 2015, supervisor Denise Dancy stated, "He has never missed a deadline. I have complete confidence that, if he is involved, the task will be completed and done well." In 2016, supervisor Gary Bracken noted that Mr. Siegel "not only touches and improves almost everything that goes out from our team, but he's also the center gear in our machine." In 2017, supervisor Chris Pharo described Mr. Siegel as "the glue that holds our internal communications team together." In 2023, supervisor Jenny Franchi called Mr. Siegel "efficient, trustworthy, and an excellent team player."

19. Prior to 2024, Mr. Siegel had no disciplinary history. He had never received a written warning, never been placed on a performance improvement plan, and never been subject to any formal counseling regarding his performance. Mr. Siegel was a loyal, dedicated employee who took pride in his work and consistently met or exceeded expectations.

**Organization and Transfer in 2024**

20. In January 2024, Leidos reorganized its Communications and Marketing department. As part of this reorganization, Mr. Siegel was transferred from the Customer Experience and Events team, where he had worked under

supervisor Jenny Franchi, to the Enterprise Communications team under a new supervisor, Melissa Bodner. The transfer was completed in June 2024.

21. During the first six months of 2024, Mr. Siegel was required to perform dual roles. He continued his responsibilities as marketing technology project manager (managing Workfront and DAM as system administrator) while also taking on the new responsibilities described above as communications manager on the Enterprise Communications team. Mr. Siegel worked diligently to manage both positions simultaneously, often working beyond the standard 40-hour workweek to meet the demands of both roles.

22. Under Ms. Bodner's supervision, Ms. Bodner frequently referred to Mr. Siegel's approach as "the old way of doing things" or "how [he] used to do things" and/or implied that he was not willing to try the "new" way of doing things – all of which was incorrect and not true.

23. Ms. Bodner seemed threatened by Mr. Siegel's age and experience and high performance level; unable to manage him properly, Ms. Bodner treated him differently than other, younger employees.

**Mr. Siegel's First Performance Problem Allegations in 21 Years**

24. On March 28, 2024, during a routine bi-weekly call with Mr. Siegel, Ms. Bodner conveyed feedback about Mr. Siegel's professional behavior for the first time and casually suggested he think about it.

25. On September 11, 2024, during a six-minute videoconference call scheduled with Ms. Bodner to discuss annual goals, Ms. Bodner and HR Business Partner

Mira Vasquez instead informed Mr. Siegel that Ms. Bodner was giving him a Memorandum of Expectations ("MOE"). The MOE outlined what Ms. Bodner viewed as Mr. Siegel's performance deficiencies and listed behavioral expectations. This was Mr. Siegel's first formal disciplinary action in 20 years of employment.

26. Moreover, the alleged "performance deficiencies" and "behavioral expectations" amounted to hyper-technical stylistic changes in Mr. Siegel's writing, such as Ms. Bodner's following comments:

Thanks:

- Were the in the press items vetted with Todd? Those should be OK-d by him each week before we include
- Please move CEO item to first spot under Latest Headlines
- Do we mean the DigMod Sector or a team within DigMod? If we're talking about a team within the Sector we need to clarify which team (this is an example of something that should be vetted and clarified before we include it here)
- **Leidos Supports Victims of California Wildfires Through Red Cross Donation ~~to the Red Cross~~**
- Women in Technology (WIT), ~~the premier~~ an organization contributing to the success of professional women in the Washington, D.C. area technology community, announced the finalists for the 26th Annual Leadership Awards, including Leidos' Carol Williamson, Roopa Vasan, and Anamika Goyal.
- There should be a concise sentence on the SmartVault item describing what the tool is, not just that winners were announced
- With should **not** be initial capped here: **Leidos Teams With CareDx to Transform the Organ Procurement and Transplantation Network**
- Didn't check links, hopefully that was done on first review

27. In response to Ms. Bodner's comments, Mr. Siegel commented why he made certain choices and followed the company style guide rather than Ms. Bodner's preferences, and he affirmed that he would do what Ms. Bodner was asking.

28. Upon information and belief, other, younger employees were not given MOEs for the same type of inconsequential "performance deficiencies" or "behavioral expectations."

29. Mr. Siegel was shocked by the MOE. On September 12, 2024, he contacted Ms. Vasquez to ask what the MOE meant, and she assured him it was not a big deal and was meant to ensure he would perform at his best.

30. On September 13, 2024, Mr. Siegel emailed Ms. Bodner expressing his surprise and concern. In that email, Mr. Siegel wrote: "I have been an employee here for 20 years, and I have never been disciplined. I am committed to the mission of the company and improving my performance in my job." Mr. Siegel requested a meeting with Ms. Bodner to discuss the MOE and her expectations in depth, and he expressed his dedication to improving his performance, despite the fact that the alleged deficiencies were not "deficiencies" at all.

31. On February 24, 2025, Ms. Bodner issued Mr. Siegel's 2024 Annual Performance Assessment. The overall rating was "Valued Performance," meaning that Mr. Siegel's contribution reflected meeting the expected level of performance across the three performance elements of Results, Impact, and Behaviors. However, Ms. Bodner gave Mr. Siegel a rating of "Low Performance" in the Behaviors category.

32. Just four days later, on February 28, 2025, Ms. Bodner placed Mr. Siegel on a Performance Improvement Plan ("PIP") for 30 days. The PIP stated that if Mr.

Siegel did not make significant improvement, further action could be taken, "up to and including termination."

33. Upon information and belief, younger employees were not placed on PIPs for similar conduct and/or performance.

34. Mr. Siegel promptly requested additional time to understand and comply with the PIP to account for paid time off he had scheduled with his wife and three children from March 14-23, 2025. Ms. Bodner granted him five extra days (for a total of 35 under the terms of the PIP), extending the PIP period until April 4, 2025.

35. The PIP contained seven pages of performance expectations that Mr. Siegel was required to meet. Many of these expectations were vague, subjective, and not measurable. For example, the PIP required Mr. Siegel to ensure that 90% of materials receive positive feedback from other team members, even though the feedback others might choose to provide was beyond his control.

36. The PIP also required Mr. Siegel to make "decisions based on data, evidence, and logical reasoning" and to "avoid reliance on assumptions," without specifying which decisions, what data and evidence to rely upon, or how to track compliance with this expectation.

37. The PIP also contained conflicting directives. For example, it instructed Mr. Siegel to attend a communication workshop no later than March 21, 2025, but it also stated that "any activities not directly associated with your project work

(e.g., training) will be suspended during this performance improvement period."

38. According to Leidos's own Performance Management guidance, Performance Improvement Plans must be "measurable, detailed, and time-bound" with clear objectives. Despite this requirement, the PIP issued to Mr. Siegel failed to provide measurable, objective criteria for success.

39. Mr. Siegel made good-faith efforts to comply with the PIP. He requested weekly meetings with Ms. Bodner to discuss his progress and seek clarification on the PIP expectations. Ms. Bodner said that they already had bi-weekly meetings on the calendar but Mr. Siegel could request the other weeks if he so desired. When Mr. Siegel sent calendar requests, Ms. Bodner accepted, but then she did not show up for the meetings.

40. On March 12, 2025, Mr. Siegel asked Ms. Bodner to walk through the PIP with him item by item so he could fully understand and comply with each expectation. However, Ms. Bodner was unable or unwilling to provide clear guidance.

41. When Mr. Siegel asked for clarification on the expectation that he "consistently assess and approach tasks and projects by thoroughly analyzing available information and considering various perspectives," Ms. Bodner responded, "We specifically left it vague because we're trying to get you to think of this yourself."

42. Throughout the PIP period and even after the PIP period ended on April 4, 2025, Ms. Bodner continued to send Mr. Siegel critical emails stating that his work was not meeting expectations. However, Ms. Bodner never provided clear communication regarding whether Mr. Siegel had met the PIP objectives or what specific steps he needed to take to improve.

**Ethics Hotline Complaint**

43. On March 4, 2025, approximately one week into the PIP period, Mr. Siegel filed a complaint with Leidos's Ethics Hotline. In his complaint, Mr. Siegel reported that Ms. Bodner was targeting him with disparate standards not applied to other coworkers, that the PIP was vague and unattainable, and that he feared retaliation. Mr. Siegel also expressed concern that he was being subjected to a hostile work environment.

44. Kate Sisson from Leidos's Workplace Relations department contacted Mr. Siegel on or about March 13, 2025, to discuss his complaint. During their conversation, Ms. Sisson agreed that sections of the PIP were "not specific at all." She assured Mr. Siegel that she would speak with Ms. Bodner and other members of the Enterprise Communications team upon her return from scheduled time off to "provide clarification" on the terms of the PIP. Ms. Sisson also assured Mr. Siegel that she would maintain confidentiality during her investigation.

45. However, Mr. Siegel later learned from a colleague that Ms. Sisson had not maintained confidentiality. Instead, Ms. Sisson openly identified Mr. Siegel as

the complainant while speaking to members of the Enterprise Communications team. This violated Leidos's Code of Conduct, which states that internal workplace investigations will be "conducted confidentially to the extent possible."

46. After completing her investigation, Ms. Sisson contacted Mr. Siegel on April 4, 2025. Rather than providing the promised clarification on the PIP, Ms. Sisson stated that the objectives in the PIP were understandable and that the issue was simply that "unfortunately, it's clearly not working between the two of you," referring to Mr. Siegel and Ms. Bodner.

**Termination**

47. On April 8, 2025, Mr. Siegel met with Ms. Bodner and Ms. Vasquez. Ms. Bodner informed Mr. Siegel that she and Verenice Camacho would determine and schedule a meeting with him regarding "next steps" by the end of the week (April 11, 2025).

48. However, no follow-up meeting was scheduled by April 11, 2025, and Ms. Bodner continued to email Mr. Siegel that his work was not meeting the expectations set forth in the PIP, even though the PIP period had expired approximately one week earlier.

49. On April 14, 2025, Mr. Siegel emailed Ms. Bodner asking whether he was still being held to the terms of the PIP. Ms. Bodner did not respond.

50. On April 15, 2025, Ms. Bodner sent Mr. Siegel a meeting invitation for a 10:30 a.m. phone call. Mr. Siegel received approximately 1.5 hours' notice of the

meeting. During the approximately five-minute call, Ms. Bodner informed Mr. Siegel that she had made the decision to terminate his employment at Leidos, effective immediately. Ms. Bodner stated that the reason for his termination was "failure to meet job expectations." Ms. Vasquez was also on the call.

51. Mr. Siegel asked if he could email his long-time colleagues to say farewell. Ms. Vasquez told him he could not and should instead immediately log out of all systems.

52. Mr. Siegel was given no specific explanation for how he had failed to meet the PIP objectives, no opportunity to address any alleged deficiencies, and no opportunity to improve after the PIP period had ended.

53. Mr. Siegel's termination occurred approximately 12 days after the PIP period ended and approximately six weeks after he filed his ethics hotline complaint.

54. In addition, Mr. Siegel’s termination appears to be the result of age discrimination.

55. Upon information and belief, Defendant replaced Mr. Siegel with a younger employee, who is less qualified to perform the job.

56. Furthermore, other, younger employees were not terminated despite performing their work similarly to, or less well than, Mr. Siegel.

**Damages**

57. As a result of his termination, Mr. Siegel has suffered and will continue to suffer significant damages. He lost his annual salary of approximately $120,000, as well as valuable benefits including 401(k) employer matching

contributions, dependent care FSA, dental coverage, Group Term Life Insurance coverage of $121,000, Group Universal Life Insurance coverage of $242,000, and other employee benefits.

58. Mr. Siegel has made extensive efforts to mitigate his damages by seeking new employment. He has submitted hundreds of job applications to employers across the country.

59. Mr. Siegel obtained unemployment benefits and also performed brief contract work in October and November 2025, earning approximately $4,000 before taxes. However, as of the date of this Complaint, Mr. Siegel has not found comparable full-time employment to replace his income with Leidos.

60. In addition to his financial losses, Mr. Siegel has suffered significant emotional distress and mental anguish as a result of his wrongful termination. The sudden loss of his job after 21 years of loyal service, combined with the stress of uncertainty about his future and his family's financial security, has caused Mr. Siegel to seek therapy and counseling.

61. Finally, Mr. Siegel has incurred attorney fees and costs as a result of the unlawful termination.

## COUNT I
## WRONGFUL DISCHARGE IN VIOLATION OF WRITTEN PERSONNEL POLICIES

62. Plaintiff re-alleges and re-affirms all allegations contained in the above paragraphs as if set forth herein.

63. At all times relevant to this Complaint, Mr. Siegel was a non-probationary employee. Mr. Siegel was employed by Leidos for approximately 21 years, from May 24, 2004, through April 15, 2025, far exceeding the 12-month probationary period.

64. At all times relevant to this Complaint, Mr. Siegel performed his duties consistently with and pursuant to Leidos's training, policies, and procedures.

65. On April 15, 2025, Leidos terminated Mr. Siegel's employment in violation of the Wrongful Discharge from Employment Act, Mont. Code Ann. § 39-2-901 *et seq*.

66. Mr. Siegel's termination was in violation of Leidos's written personnel policies, including but not limited to Leidos's Performance Management guidance, Code of Conduct, Policy PR-HR-6.4 (Harassment-Free Workplace), Policy PR-HR-6.10 (Termination and Layoff), Performance Assessment FAQs, and the Performance Improvement Plan itself.

67. Leidos materially violated express provisions of its own written personnel policies prior to and in terminating Mr. Siegel from employment. Specifically, Leidos violated its Performance Management guidance, which expressly requires that Performance Improvement Plans be "measurable, detailed, and time-bound." The PIP issued to Mr. Siegel on February 28, 2025, contained vague, subjective, and non-measurable performance expectations that failed to provide clear, objective criteria for success.

68. Leidos violated its Code of Conduct and Policy PR-HR-6.4, which require that internal workplace investigations be "conducted confidentially to the extent possible." Kate Sisson from Workplace Relations openly identified Mr. Siegel as the complainant while speaking to members of the Enterprise Communications team, in direct violation of Leidos's written confidentiality policies.

69. Leidos violated its Code of Conduct and Policy PR-HR-6.4, which expressly prohibit retaliation against employees who report concerns or file internal complaints. Mr. Siegel filed an ethics hotline complaint on March 4, 2025, and was terminated approximately six weeks later on April 15, 2025, in violation of Leidos's written anti-retaliation policies.

70. Leidos violated Policy PR-HR-6.10, which requires that line managers, in coordination with Workplace Relations, provide written notification of separation that includes the reason for separation "whenever practical." Mr. Siegel's termination notice provided only a vague statement that he was terminated for "failure to meet job expectations," without any specific explanation of how he failed to meet the PIP objectives or what deficiencies led to his termination.

71. Leidos violated the terms of the Performance Improvement Plan itself, which stated that Ms. Bodner would "meet with you on a regular basis to provide feedback on your performance and to track your progress" and encouraged Mr.

Siegel to "ask questions and identify ways in which we can help you be successful in your position."

72. Instead, Ms. Bodner actively discouraged Mr. Siegel from asking questions, refused to provide clear guidance on the PIP expectations, and resisted helping Mr. Siegel succeed.

73. Leidos's violations of its own written personnel policies deprived Mr. Siegel of a fair and reasonable opportunity to remain in his position of employment with Leidos.

74. Leidos's stated reasons for Mr. Siegel's termination were false, pretextual, and lacked any basis in fact under the circumstances.

75. As a direct, immediate, and proximate consequence of Leidos's wrongful termination of Mr. Siegel in violation of its written personnel policies, Mr. Siegel has incurred and will continue to incur direct and consequential damages, including lost wages and the loss of valuable and extensive fringe benefits.

76. As a result of his termination in violation of Leidos's written personnel policies, Mr. Siegel has sustained and will continue to sustain lost wages and other benefits of employment.

**COUNT II**
**WRONGFUL DISCHARGE FOR LACK OF GOOD CAUSE**

77. Plaintiff re-alleges and re-affirms all allegations contained in the above paragraphs as if set forth herein.

78. At the time of his discharge, Mr. Siegel was not a probationary employee. Mr. Siegel had been employed by Leidos for nearly 21 years, from May 24, 2004, through April 15, 2025.

79. At all times relevant while employed by Leidos, Mr. Siegel performed his job consistently with and pursuant to Leidos's training, policies, and procedures.

80. On April 15, 2025, Leidos terminated Mr. Siegel from his employment in violation of the Wrongful Discharge from Employment Act, Mont. Code Ann. § 39-2-901 *et seq*.

81. Mr. Siegel's discharge was wrongful because it was not for good cause.

82. For nearly 20 years of his employment, Mr. Siegel consistently received strong performance reviews from multiple supervisors, with ratings of "Far Exceeds Expectations," "Frequently Exceeds Expectations," "Strong Performance," and "Valued Performance." Even his most recent 2024 performance review showed an overall rating of "Valued Performance" despite a Low Performance rating in Behaviors.

83. Shortly before terminating Mr. Siegel's employment, Ms. Bodner promised Mr. Siegel a 3% raise for 2025, which is inconsistent with genuine performance concerns justifying termination.

84. The Performance Improvement Plan imposed on Mr. Siegel contained vague, subjective, and non-measurable objectives that failed to comply with Leidos's own policy requiring PIPs to be "measurable." Ms. Bodner actively discouraged

Mr. Siegel from asking questions and refused to provide adequate support or guidance during the PIP period.

85. After the PIP period ended, Leidos failed to communicate whether Mr. Siegel had met the PIP expectations before terminating his employment approximately 12 days later.

86. Mr. Siegel's termination occurred approximately six weeks after he filed an ethics hotline complaint on March 4, 2025, suggesting the termination was pretextual and retaliatory rather than based on legitimate performance concerns.

87. Leidos did not have a legitimate, substantial, job-related reason grounded in rational business purpose for discharging Mr. Siegel from his employment.

88. The stated reason for termination, "failure to meet job expectations," is insufficient to constitute good cause given Mr. Siegel's 21 years of strong performance, the deficiencies in the PIP process, and the suspicious timing relative to his ethics complaint.

89. As a direct, immediate, and proximate consequence of Leidos's wrongful termination of Mr. Siegel without good cause, Mr. Siegel has incurred and will continue to incur direct and consequential damages, including lost wages and the loss of valuable and extensive fringe benefits.

90. As a result of his termination without good cause, Mr. Siegel has sustained and will continue to sustain lost wages and other benefits of employment.

## COUNT III
## DISCRIMINATION IN VIOLATION OF THE MONTANA HUMAN RIGHTS ACT AND THE AGE DISCRIMINATION IN EMPLOYMENT ACT (TERMINATION)

91. Plaintiff re-alleges and re-affirms all allegations contained in the above paragraphs as if set forth herein.

92. Mr. Siegel is a member of a protected class because he is over the age of forty (40). At the time of this Complaint, Mr. Siegel is currently 49 years of age.

93. At all times relevant to this Complaint, Mr. Siegel was performing his job satisfactorily.

94. In April 2025, Mr. Siegel was subjected to an adverse employment action when he was terminated from employment.

95. Mr. Siegel was treated less favorably than other, younger employees.

96. Defendant does not have a legitimate, nondiscriminatory reason for terminating Mr. Siegel.

97. Mr. Siegel was successfully performing his job and there was no reason to terminate his employment.

98. The ADEA prohibits employment discrimination against employees aged 40 and older.

99. The Montana Human Rights Act likewise prohibits discrimination in the workplace on the basis of age. Mont. Code Ann. § 49-2-303(1)(a).

100. Defendant violated the ADEA when they terminated Mr. Siegel.

101. Defendant violated the MHRA when they terminated Mr. Siegel.

102. The discrimination has caused Mr. Siegel anxiety, stress, fear, depression and emotional distress.

103. The discrimination has resulted in past and future loss of wages and other benefits to Mr. Siegel.

104. Mr. Siegel has also incurred attorney fees and costs as a result of Defendant's discriminatory practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Stephen C. Siegel should be awarded the following relief:

1. Past and future lost wages and the value of benefits that he would have earned but for the unlawful termination;
2. Pre- and post-judgment interest as allowed by law;
3. Compensatory damages for emotional distress, anxiety, fear, humiliation and all other available damages under state and federal law;
4. An award of reasonable attorney's fees and costs; and
5. Such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in the above cause and on all issues so triable.

DATED this 10th day of April, 2026.

AT LEGAL PC

Adrienne M. Tranel

Adrienne M. Tranel, Esq.
*Attorneys for Plaintiff*